If it pleases the court, my name is Brian Knutson. I am here on behalf of Plaintiff Blow, Wild Fish Conservancy, the appellant herein. This matter involves a challenge to a biological opinion and incidental take statement issued under the Endangered Species Act at the Leavenworth National Fish Hatchery located on the Icicle Creek River right outside of Leavenworth, Washington. Unless the court has questions or concerns with specific issues, I would like to focus today on the biological opinion's segmented analysis of hatchery impacts. Well, undoubtedly we'll have some questions. Okay. Go ahead. The underlying statutory provision that Wild Fish Conservancy is seeking to enforce here is Section 782 of the Endangered Species Act, which provides that all federal agencies shall, in consultation with, as applicable here, the United States Fish and Wildlife Service, ensure that any action carried out by that agency is not likely to jeopardize the continued existence of threatened and endangered species. Okay, so here's, can we put this into real terms? I mean, I'm not being critical, but this is a hatchery that's been in operation since 1940. So there's this whole history of operation on this river, and as I understand it, there is a installation contemplated, which seems to be pushed back, which is the water intake system is going to have some impact on the way the hatchery operation affects the fish that are salmon and the trout and however else. And that what the BIOP opinion was focused on, the agency action, was this interim management plan that the government is proposing to apply to the river in the meantime. And so it's a five-year, estimated five-year anyway, frame of reference. And they say, all right, we look at it and we say it's not going to materially adversely affect, it's not going to improve it, but it's not going to, in our estimate over the five years, make it significantly worse. Indeed, we hope it's going to make it slightly better. And then when the building, the hard structure goes in, whatever it is, this water intake system, we admit we're going to have to do a whole new assessment. So are you arguing that that's not an appropriate action? Or that is that somehow in doing that they have to go back and nonetheless look to see whether or not they put in this water intake system. They have to use this event that we're talking about as a way of going back to see whether or not the hatchery should continue to operate at all. Well, certainly we're not. Or certainly with respect to Sites 2 and 5, I think, or the dams, whatever they're called. Sure. Your Honor, you know, the Fish and Wildlife Service has argued that a new water intake system will be completed sometime by the end of 2011. And they've also argued that there will be a subsequent project to be completed within a couple years after that that will require, again, yet again, another Endangered Species Act consultation. But, and what they've argued is that their segmented approach or their limiting their jeopardy analysis in this case to a few years is reasonable because they are going to have to change operations as opposed to predicting what that change is going to be. My understanding is that the problem isn't really what action they're looking at. At least I find it hard to understand how they have looked at, if they looked at anything more than that, they'd be looking at contingencies. But the question is, what effects do they have to look at? Is that not, I mean, or is there a distinction there? Which one are you arguing? Are they arguing that they had to, they could look at the five-year period, but they had to look at the long-term effects of the five-year period, not just the short-term effects of the five-year period? I think that's exactly what we're arguing, Your Honor. That's quite different from saying they couldn't just look at the five-year management plan. They need to account for the factual findings here. And the factual findings are that the Icicle Creek bull trout population is critically low and that the hatchery has caused that situation. And going down. In other words, my understanding of the report in the end is they never actually say it's getting better, although they use that term sometimes. But all they mean by that is it's getting bad less quickly. That's right. They said the decrease is becoming less decreasing is what they said, Your Honor. Translate that into real-world terms. I mean, there is something that is going to change the operations on the river, a hard asset type of improvement. And they say we're going to, once that is operational, we will look then to see what the effects are of that as a changed circumstance. Meanwhile, as we're leading up to that, we're trying to find out whether we're assessing whether what we're doing is going to worsen, improve, or whatever what's going on on the river. Sure. I just want to emphasize that here the United States Fish and Wildlife Service is not committed to making any improvements that are going to prevent the eventual loss of this population. So that was what I was trying to get at at my opening question. Are you arguing that because they have instituted this plan, it now opens up the whole management of the hatchery, regardless of whether they put the water intake system, they have to now assess it, use this action to now assess, with the baseline being everything that's happened all the way up through 2001, I guess it is, and they have to now look from 2001 all the way to as far as they can reasonably project into the future, regardless of whether the system comes on. Right. Well, the Endangered Species Act is a little bit different than some other environmental statutes, like the National Environmental Policy Act, for instance. And so the five-year management plan, as they call it, is not a triggering action that requires them to consult on hatchery operations. What triggered consultation on hatchery operations under the statute was the listing of the species in 1999. And although Fish and Wildlife did not formally consult until this litigation was initiated in 2005, that was the listing of the species triggers them to determine whether or not the operations of that hatchery conflict with the preservation of the species. Can you just finish so I can make sure? Yeah. And so that's it. And so, you know, they need to make predictions regarding whether or not the hatchery operations conflict. And, you know, the hatchery limited their, you know, they submitted a biological assessment as part of the formal consultation process, and they requested that Fish and Wildlife, their own agency, limit the analysis to five years. And they said, look, we have these other projects. We're going to try and make improvements in the future. Please only consult for the next five years. And, in fact, Fish and Wildlife Ecological Services, the sort of other arm of the agency doing the consultation, said, look, that's going to get us in trouble for incrementing. You need to allude to some sort of concrete changes in the future in order that our decision doesn't look arbitrary. All right. Thank you. Go ahead. So did, if you, if they had done it the way you think they should have done it, what would they do? I mean, given the fact that, would they run the bio op out on various contingencies and say, if we continue to do it this way, this is what will happen, and if we were to fix the water intake system, this is what would happen if we were to fix, there was some notion that by 2013 they were going to try and deal with the upstream problem. Then this would happen. Is that what you're suggesting? They should have done it by looking at various contingencies, or if we stopped operating the dam altogether, this is what would happen? I think that's right. This court ruled in the case of Conner v. Buford in 1988 that the requirement in the Endangered Species Act that an agency use the best available data requires it to make projections regarding future operations and the impact on the species in order to ensure that the species will not be put into jeopardy. But there the contingencies really weren't contingent. If you're leasing land for oil and gas exploration, there's going to be oil and gas exploration, and to simply stop at the lease when you know that the people who are there are going to do oil and gas exploration, that's why they're leasing it, is just silly. I mean, here, I'm not sure why it wouldn't be okay to limit it to the five years if they had done an analysis of why the impact in the five years, during the five years, was clearly retrievable at some later point. So do you think they did that analysis? No, Your Honor, I don't think they did. And I think your point is valid, but I also think that the case law that's come out of the Endangered Species Act jurisprudence holds that if an agency is going to rely on future improvements, there needs to be firm commitment subject to deadlines, and most importantly, those future improvements need to deal with the jeopardy situation, and here there's no commitment, there's no plan. So let me just start. So I'm still, you know, retrievable on all of them. I don't know what that means. In other words, I'm trying to understand your view of what they need to do, short-term, long-term. Are you suggesting that because they listed bull trout as endangered, they had an obligation to look at the entire operation of the hatchery, and that on the table was the closure, potential closure, shutdown of the hatchery? Well, first of all, Your Honor, my client certainly believes that the hatchery can operate. But that would be one of the things they'd have to look at. I think that's absolutely right, Your Honor. I think the Endangered Species Act has substantive requirements that don't account for, you know, the preservation of the species above other agency priorities. Okay, so on the table, they should have gone in with the mindset, the whole range of options from going to this proposed action, which we hope will happen, which we think needs to happen because of aging out and everything, but on the table is the hatchery can't coexist with the bull trout because of the history of decline of the population, its impact on the species overall, or it can operate, continue to operate, but you have to shut down, you have to remedy dams two and five either entirely or work around them. They should come up with something else. They shouldn't be investing money in the water intake system like the oil and gas thing. You shouldn't go into the lease and go for that if you're going to find out ultimately drilling is going to be harmful. So stop it at the beginning rather than at the outset. So that's why you're citing Connor, I gather. Exactly, Your Honor, and I do think all that was on the table. Okay, so what they should have done then to take into account these so-called long-term effects, what should they have been looking at that they didn't look at? Well, I think the Jeopardy analysis needs to account for several important findings, scientific findings that Fish and Wildlife made. They found that the Icicle Creek bull trout population is critically low, that the hatchery is the primary cause, if not the sole cause of that, and that although it's made some minor improvements, it's going to continue to cause that population to decline, and that population will most likely not be reestablished if it's lost. Ergo? Ergo, they should have determined, one, either whether the loss of this population constitutes jeopardy, and we don't know if it does because they limited their analysis to a few years, and if it does, they need to impose reasonable alternatives or terms and conditions that address the jeopardy issue in a time before the population is lost, but they cannot delay identifying what is necessary to avoid jeopardy to some future. Okay, John, as far as I can tell, the only reasons they concluded that the five-year decline wasn't going to matter, wasn't appreciable, whatever the language is, is because it had been around for 70 years, and that doesn't seem to me to prove anything because at some point there's a tipping point, and the question is, so they didn't, suppose they had done, and I don't know what this analysis would look like because I'm not a biologist, but some sort of numerical analysis that showed what the tipping point was and it wasn't going to happen in the five years. Would that be good enough? Your Honor, I think that they still need to address the fact that, I think they need to address whether or not the hatchery is going to cause the loss of this population, and if so, whether or not that loss constitutes jeopardy. And if it does, they need to determine when that tipping point is and impose terms and conditions that prevent that tipping point from being reached. So you are saying, but take my scenario. Suppose, did they do what I'm suggesting? Did they do enough, if I thought, if my legal version was right, did they do enough to demonstrate that during the five years that tipping point wasn't going to occur? Well, I don't think they did. I mean, they said that this population is certainly currently and will continue to be at an increased risk of extirpation. They said that chances of it happening during this five years are low. It would take some sort of catastrophic event like a forest fire or something like that. But is there any background to that other than that it's been around for 70 years? You know, I think that the biological opinion is pretty detailed. And, you know, I do give Fish and Wildlife a lot of credit because they did do a very thorough job on the scientific factual findings, which were not challenging here. And so, you know, not having read the 130 pages in the last couple of days, I would say that I think that I read the 130 pages in the last couple of days. And as far as I could tell, they said how many fish were going to be impacted, but they didn't in any way I can understand say why that number of fish wasn't enough to make it eventually impossible to not only save but recover population. Yeah, they did find – I'm sorry. I know I realize I'm out of time. Go ahead and finish the answer. They did find that the population is currently critically small. It's the smallest and most threatened in the Wenatchee Corps area. The spawning population consists of less than 20 fish right now, although the river itself is capable of supporting thousands of spawning bull trout each year if migratory passage was provided at the hatchery. Okay. Thank you. Thank you. I'll give you a minute on rebuttal. May it please the Court, my name is Tekla Hanson-Young, and I represent the Fish and Wildlife Service. What is striking, and I think that this came out in the questions that were just asked, is that the Conservancy actually wants something here that may be less protective for the bull trout than what the Fish and Wildlife Service has actually done. What the Fish and Wildlife Service did was complete a biological opinion for an operations and management plan that would only be in existence for five years. This guarantees that the service will reconsult by the end of 2011, and when it reconsults, it will actually look at all of the data that it gathered in the last five years, and it will incorporate that into the new baseline to determine when the next tipping point is going to be, and to require the Fish and Wildlife Service to come up with these theoretical possibilities for what the new water intake system might look like, what it might not look like, what the eventual restoration project will look like, how that might affect the fish population 30 years from now would be in effect to give the Fish and Wildlife Service a pass for whatever it decided it wanted to do. When you say, just a minute, when you say what it would look like 30 years from now, when this new opinion is done, 2011, 2012, whenever it is, will that look 30 years down the line? Well, we don't know what it's going to look like, and I would argue that it is... You're sort of saying you should never look 30 years down the line, aren't you? What I'm saying is... You know, toward possible extirpation, because you're saying, well, you know, the population is decreasing, but it's only going slowly. You could say that every five years. That is correct. You could, in fact, say that every five years, and in fact, the way that the historical operations have been at the dam, you could say that every 67 years, because the fish have not been extirpated, and in fact, it appears that the decline has been a very slow decline over the past 67 years. That's totally illogical, because if you have a population, which is a relatively small one to begin with, and every year it loses even a couple fish, eventually it's going to get to the non-viable stage, which, as I understand it, is not zero. It is higher than zero, and eventually it's going to get there. And what I find about this bio-op is it gives me no clue as to when it's going to get there, if things just stay the way they are. I think you're right, and I think that's because the Fish and Wildlife Service doesn't really know when it's going to get there. Well, it also gives me no clue why they think it's not going to get there in five years, other than that it's been around for 70 years, which is not an answer. I think that you're right, and that the biological opinion does rely on the fact that the fish population has existed for the past 67 years as a reason to support its finding that it will continue to exist. But there's other reasons, too. For example, there have been increased passage opportunities as a result of opening up structures two and five. But it's still going. The bottom line, even though there's language, very confusing language in the bio-op, where sometimes it seems to be saying there's a contribution to the survival, but in the end there isn't a contribution to survival. It's going down. Right? I think you are correct in that the biological opinion does say that there is a long-term decline, but you have to look at that decline in the context of 67 years of decline. And in other words, the decline is not necessarily going to mean that the population is going to die in one year. But it's not necessarily not going to mean that. That's my ultimate problem. It seems to me that there should have been some sort of a modeling that gives us some reason to think that the decline that's going to occur over those five years is not going to be what's going to do in this population. And it's not there. Is it there? I do think it's there. I think, I mean, I think the analysis of the effects of the action where it talks about, and I can give you the large pages if you would like, but the biological opinion goes into detail, and even the Conservancy agreed, that it goes into detail about the effects of the action, the effects of the operations of the structures, when the structures are going to be open and closed, how many fish are able to migrate up, and whether or not. It doesn't do that. It says they saw a couple fish. It does say that they saw a couple fish. But I think the reality is they're using the best scientific data that they have, and that's all that the agency is required to do. And they don't have a lot of data because they've only been studying these fish for the last 10 years. And I think that's another reason that the fact that the Fish and Wildlife Service has to do another consultation. But. Will be better because it can incorporate that new data. But as your opposing counsel says, in the ESA, everything is kind of switched in the sense that you have to prove what is, at some point you do have to prove with some certainty what is going to happen. And if you can't demonstrate that, in fact, this period is not going to be the do-in period, the period that's going to do them in, then isn't that just inadequate per se? I think that they were able to demonstrate that the operations plan for this period, which will change or will be reevaluated by 2011, was not going to do in the Icicle Creek population. And even, and I think we also need to separate the question of whether the Icicle Creek population will be extricated from whether or not that will cause jeopardy to the species. I really, I would like to point out, Your Honors, that the Icicle Creek population is one of seven in the core area and one of 500 in the Columbia River Interim Recovery Unit. And there's five Interim Recovery Units. Right. And again, as Mr. Newson suggested, therefore, if they have found, and you see a brief heading off in this direction, but the bio-op is not, that this population doesn't matter, if they had just said, fine, let's assume it's going to disappear, it doesn't matter, well, that might be okay, too, but they didn't make that finding. They didn't because the population does matter. It could operate as a buffer, for example, to if other populations died, then because this population is isolated from the rest of them, it could act as a buffer to other populations. And in that event, if other populations died off, then the Fish and Wildlife Service would have to reinitiate consultation and study the new effects of the new, you know, environmental baseline and determine what it had to do to protect the species and ensure that the species would not be jeopardized by its actions. Okay. I have two related questions. One is there is a – there are some numerical targets. That's correct. That are set forth. One is what has been done to monitor, what's provided for monitoring to determine whether those targets have been met. And since we are now in 2010, and we now have presumably this plan that's been in place for almost the five years, in light of that monitoring, has there been any on-the-ground evidence that the tipping point concerns might have been understated in the five-year projection that was done? And if the – and my third part of the question really is, if you're saying that with the intake system beginning in 2011, a new consultation, what are we talking about in the real world as to how things are going to operate from assessing, reassessing? Well, let's suppose we agreed with the plaintiffs in this case and say you've got to go back and redo it. What is the redo going to look in any way different from what you're proposing to do in any event with the next consultation? And the reason I started out with the monitoring is if there's some kind of urgency about this. Right, there is monitoring that is required in the incidental take statement, and that monitoring involves monitoring the water intake system. Well, that's for the entrainment. I'm talking about the other one, the injuring up to 20 migratory trout and so on. I don't see anything that shows how they're going to monitor and test to see whether or not those targets. I'm looking at ER 136 and 139. The take statement does not specify the manner in which the service should monitor the migratory, the 20 take that would result from the blocked migration, but the service has, in fact, been monitoring it. They conduct annual snorkeling surveys where they should go into the water and look for fish, and they will do so at times after they've opened the gates when there have been passage opportunities. And in the past year, actually, during the May to July timeframe, they opened up one of the structures so that fish could actually pass even throughout that May to July timeframe. And, in fact, when they open those structures up, they go in the water afterwards, check, and they, in fact, see that fish are moving upstream. They've also done spawning ground surveys, which indicate that there's been an increase in the number of reds, which are the fish, so that's how they breed. There's been an increase in the number of migratory reds upstream, far past where they ever thought migratory bull trout could go. And all of those, all of the data, they also do radio telemetry studies, which involves when they catch fish, they tag them, and then they follow their movements. And when they do that— Okay, now you're getting stuff that's not on the record, so that brings me— could you turn now to my question, how do—what's—this is not a static situation, and so what happens under the— It's a dynamic situation, and they have had no indication that the fish are in trouble at all. Okay, but then how does this superimpose itself onto what you're telling us is going to happen with the intake system? Well— When is that going to start happening? When will all of this communication start again so we aren't trying to litigate this in the Ninth Circuit? You're doing it with the people who have strong interests in this. That's correct. I mean, the Fish and Wildlife Service is actually working with a lot of groups, including the Conservancy, on a new design for the water intake system. The preferred design that they had been working on, or that's probably a term of art, but the design that they were looking at most closely would have actually involved rebuilding Structure 2 to allow year-round passage opportunities for bull trout. There's a fish trap at Structure 5, so when the fish come up their first block by Structure 5, they would go into the fish trap, then they would move— the service would move the fish out of the fish trap upstream. They would then have to go up the historic channel to Structure 2, which is now closed for part of the year but would be open year-round as a result— that was what was involved in the design that they were considering would be open year-round. Fish could move up past Structure 2, and then they could continue their migration up past— there's a field of boulders that they actually thought in the past could not be passed at all by the fish, but they'll work their way up. So that was one of the major components of the design that they were looking at. Unfortunately, and as we wrote in a letter to the court, the design that they were looking at had some engineering problems having to do with— they couldn't figure out how the water would stop from freezing in the intake, so they're actually having to go back and look at a new design. But in any event, they will be required to consult again in 2011. There's also another reason why they're going to have to consult pretty soon again, and that's a critical habitat designation. The Icicle Creek area has been proposed— Can I just ask a question? We often find ourselves as judges in the position of adjudicating something that is dynamic, and in the past, mediation has got the parties together. If the parties are talking, consulting now, is there any reason that the problems that we're being required to decide can't be resolved on the ground in light of current circumstances? Are the parties so far apart on this that a mediation couldn't help? I think that the service would be willing to talk with the conservancy to see what sort of a time frame they would think is reasonable, but the reality is the conservancy has never proposed an alternative time frame. And this is the first indication, hearing them in court today, that they would have liked the service to evaluate all these hypothetical possibilities for the future and include that in the biological opinion. It hasn't been clear to the service what time frame the conservancy thinks is reasonable, and I believe the service would be open to getting some input. I know the conservancy has been working with the service and giving them data as they find it. So really, I mean, this lawsuit is— Okay, I don't want to get you too far off track, but can I then understand—and then I'll shut up. When does the service contemplate the consultation for the new biop beginning? They will do so before the expiration of this operations and management plan. So before 2011, they will initiate the consultation and have a new biological plan. What we're really saying then is if we were to reverse this and tell you to go do it over again, it would basically be coincident with the time that you could be doing it over again anyway. That is absolutely correct. They're going to have to do another consultation, and in doing so, they're going to take into account all of the new data they've gathered. And if they haven't determined a proposed design yet, then they're going to have to— they won't actually be able to look at that, or they could list, you know, the five designs. I guess it would depend on what this Court asked them to do. But if you remanded, if you reversed and remanded for preparation of a new biological opinion, they would be doing that anyway. What's the date that the current plan is going to expire? The end of 2010? End of 2011. End of 2011. Yes, that's correct. I would also—well, I see I'm out of time, so if the Court has no other questions, I would ask the Court to affirm the decision of the District Court because the Fish and Wildlife Service was not arbitrary and capricious in issuing this biological opinion. Okay. Thank you very much. I'll give you a minute to— Thank you, Your Honors. I'll just be really brief, and I want to emphasize that we certainly do appreciate the United States Fish and Wildlife Service cooperation, and there is a long relationship. It actually goes back well over 10 years now. The Wild Fish Conservancy has been working on the Icicle Creek River with the service. But there are some real entrenched differences here, and I don't think mediation would serve any useful purposes at this point. And although Fish and Wildlife does certainly intend on issuing a new biological opinion soon, because of the differences in positions that have been taken on this current biological opinion, Wild Fish Conservancy is here appealing this, looking for some direction, that hopefully the Fish and Wildlife will have in time when they're working on their next biological opinion. And just really quick, I want to talk about their criticism of the Wild Fish Conservancy's requesting them to make projections. I just want to say the sort of incremental step that they're proposing, the real problem with that is at the end of each consultation, the environmental baseline is degraded, and this population is slightly worse status. And so therefore, the Jeopardy conclusion is taking that into consideration each time, and eventually you're just going to have a population that's not there anymore. But we only have one five-year, right? This is the first of a series is what you're suggesting? Well, I'm saying that they have expressed that they are going to complete yet another biological opinion shortly after the new water intake system in conjunction with some sort of other type of restoration project. But that could be 30 years. Well, they suggested it would be 2013 in the current biological opinion. I have just a final question, which is what ultimately are you saying the guidance you want? Do you want us to say that they simply cannot do this incremental studies, that they have to now do a biological opinion on the continued operation of the hatchery in total? I'm really going back to Judge Fischer's first question. And spin out all possible hypotheticals and come to some conclusion? Or are you saying they can do it in increments, but that they have to, with regard to the increments, demonstrate the long-term effects in a way they haven't done here? Yeah, I think that's right, Your Honor. What's right? I'm asking you A or B. Compound question. I think they could do it either way, but let me just say that Fish and Wildlife, in fact, has a regulation that allows incremental biological opinions only in circumstances where an agency is authorized by statute to complete its action in increments. And there, the increment action can go forward only if Fish and Wildlife finds that the increment is not likely to cause jeopardy and also that Fish and Wildlife determines that there's a reasonable likelihood that the entire action is not going to result in jeopardy. And so what we're seeing is they need to make reasonable projections based on this. But again, calling this incremental is a little odd. I mean, you have, unless you're, because the hatchery is there, and it isn't that, and the question is how are they going to run the hatchery? So it's not like the oil and lease situation where they're going to do different things over the time period. They're doing the same thing ad infinitum, and the question is can they chop that same thing into pieces? And what's your answer to that? You know, I think the answer is they're not supposed to. I think the Endangered Species Act requires evaluation of the entire agency action, and I think the agency action here is the operation of the hatchery. I think calling it a five-year operation plan is arbitrary. You know, I don't think Fish and Wildlife has explained in any way why the completion of a water intake system is going to change their impact on fish. Well, she just said that one model for the intake system would have changed not only the intake system, but also the migratory problem. Right. Okay, I think we have the point. Thank you, Your Honors. Thank you both. A very interesting case, and we appreciate both of your arguments. Case is submitted.
judges: Tashima, Fisher, Berzon